RENDERED: APRIL 16, 2021; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2019-CA-0374-MR

REBECCA CUNDIFF, AS THE
EXECUTRIX OF THE
ESTATE OF PHILLIP CUNDIFF                                        APPELLANT

APPEAL FROM JEFFERSON CIRCUIT COURT
v.            HONORABLE OLU STEVENS, JUDGE
ACTION NO. 16-CI-003504

DR. ALLEN CHENG, UNIVERSITY OF
LOUISVILLE PHYSICIANS, INC.;
KENTUCKY ONE HEALTH, INC.; AND
JEWISH HOSPITAL & ST. MARY'S
HEALTHCARE, INC.                                                 APPELLEES

AND                        NO. 2019-CA-0457-MR

KENTUCKY ONE HEALTH, INC. AND
JEWISH HOSPITAL & ST. MARY'S
HEALTHCARE, INC.                                           CROSS-APPELLANTS

CROSS-APPEAL FROM JEFFERSON CIRCUIT COURT
v.            HONORABLE OLU STEVENS, JUDGE
ACTION NO. 16-CI-003504

REBECCA CUNDIFF, AS THE
EXECUTRIX OF THE
ESTATE OF PHILLIP CUNDIFF                    CROSS-APPELLEE


OPINION
AFFIRMING

** ** ** ** **

BEFORE: CLAYTON, CHIEF JUDGE; ACREE AND LAMBERT, JUDGES.

ACREE, JUDGE: Rebecca Cundiff, as Executrix of the Estate of Phillip Cundiff,[1]

appeals the Jefferson Circuit Court's pre-trial partial summary judgment that

Jewish Hospital & St. Mary's Healthcare, Inc. and KentuckyOne Health, Inc.

(Jewish Hospital)[2] are not vicariously liable for Dr. Erik Dowden's alleged medical

negligence. Cundiff also appeals the denial of his motion to strike a juror for cause

and his motion for a new trial, and/or to alter, amend, or vacate the verdict.

Because we affirm the jury verdict and judgment, and interlocutory

summary judgment, Jewish Hospital's prophylactic cross-appeal is moot.

---

[1] Phillip Cundiff passed away after the trial of his case but before taking this appeal. The Estate substituted as the proper party to pursue appellate review. For simplicity, this Court will refer to the Appellant as Cundiff, using masculine pronouns.

[2] KentuckyOne Health is affiliated with, and has an ownership interest in, Jewish Hospital & St. Mary's Healthcare, Inc.

# BACKGROUND

On July 24, 2015, Cundiff underwent open-heart quadruple bypass surgery at Jewish Hospital, in Louisville. Appellee Dr. Allen Cheng, an employee of Appellee University of Louisville Physicians, Inc., performed the procedure. Cundiff subsequently experienced significant bleeding. Dr. Cheng ordered his chest immediately reopened to address the problem. The nature of the complication required Dr. Cheng to open and close Cundiff's chest multiple times before the bleeding was controlled by packing surgical sponges around his heart.

By July 29, 2015, Cundiff sufficiently recovered to enable Dr. Cheng to perform a chest washout and closure, a follow-up procedure intended to remove the surgical sponges and permanently close his chest. During the procedure, Dr. Cheng removed two sponges not listed in Cundiff's medical chart. There was apparent confusion regarding the number of sponges packed in Cundiff's chest. To ensure all sponges were removed, Dr. Cheng ordered X-rays. The X-rays were read by Dr. Erik Dowden, a radiologist employed by Radiology Specialists of Louisville, a physicians group contracted to provide such services.

Dr. Dowden reported no sponges in Cundiff's chest. Dr. Cheng closed Cundiff's chest and sent him to the ICU to recover. A CT scan contradicted Dr. Dowden's report and showed two surgical sponges remaining in Cundiff's chest cavity and causing significant permanent injury.

Cundiff filed a medical negligence claim against Dr. Cheng, University of Louisville Physicians, Inc., and Jewish Hospital. Because the limitations period had lapsed for actions against Dr. Dowden and his employer, neither was named as a defendant. However, Cundiff amended his claim against Jewish Hospital to allege its vicarious liability for Dr. Dowden's negligence based on the doctrine of *respondeat superior* and ostensible agency principles.

Discovery reached a point regarding the vicarious liability claim that both Cundiff and Jewish Hospital concluded there were no genuine issues of material fact. Consequently, each moved for partial summary judgment on that issue. The circuit court concluded, on these undisputed facts, that Dr. Dowden was not Jewish Hospital's actual or ostensible agent; therefore, Jewish Hospital was not vicariously liable for Dr. Dowden's conduct.[3] The circuit court entered its partial summary judgment on this issue on December 19, 2018, a few weeks before trial.

The jury trial commenced on January 14, 2019. During *voir dire*, Juror 2225780 said his wife was a nurse who previously worked at Jewish Hospital and was then employed at a KentuckyOne affiliate. Cundiff moved to strike the juror from the pool for cause. After considering the juror's statement that he did not think these facts would cause him to hesitate in ruling for Cundiff if his claim was supported by the evidence, the circuit court denied the motion. Cundiff

---

[3] Two radiologists were named in the order. Only Dr. Dowden's status is at issue in this appeal.

-4-

declined to remove the juror by peremptory strike. The case proceeded to trial, and the jury returned a verdict in favor of all defendants.

Cundiff filed motions pursuant to Kentucky Rule of Civil Procedure (CR) 59 but the circuit court denied the motions. These appeals followed.

## ANALYSIS

On direct appeal, Cundiff argues the circuit court: (1) erroneously granted partial summary judgment in favor of Jewish Hospital when it determined Dr. Dowden was not its actual or ostensible agent; (2) abused its discretion by failing to strike Juror 2225780; and (3) abused its discretion by failing to grant his motions brought pursuant to CR 59.

### 1. *Partial Summary Judgment*

"The standard of review on appeal of summary judgment is whether the trial court correctly found there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." *Carter v. Smith*, 366 S.W.3d 414, 419 (Ky. 2012). "The record must be viewed in a light most favorable to the party opposing the motion for summary judgment and all doubts are to be resolved in his favor." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 480 (Ky. 1991). We review the substance of the circuit court's ruling on a summary judgment motion *de novo*. *Blankenship v. Collier*, 302 S.W.3d 665, 668 (Ky. 2010).

## A. *Respondeat superior liability*

The focal point of the parties' dispute over what they simply call "actual agency," is a list of nine (9) factors found in only a portion of subsection (2) of Section 220 of both the original Restatement of Agency and the Restatement (Second) of Agency.[4] Over the last century, courts used these nine factors in quite different ways in two separate branches of our jurisprudence.

The first branch finds its roots in the common law of torts, and it existed well before our most recent constitution. *Sandford v. McArthur*, 57 Ky. 411, 417 (1857) ("doctrine *respondeat superior* . . . always applies in civil suits, for . . . torts . . . of agents . . . ."). This branch addresses the question whether a third party is liable to a claimant for a tortfeasor's negligence based on the doctrine of *respondeat superior*.

The second branch has nothing to do with third-party liability and is a newer outgrowth of our jurisprudence. It sprouted in the field of employment law after reform movements succeeded in passing legislation to protect unemployed and injured workers. What matters is whether an employee-employer relationship implicates the legislative scheme, not whether the employer was responsible for his

---

[4] The text of Section 220(2) in the original 1933 Restatement is repeated, nearly word for word, in the second edition. *See Sellards v. B. & W. Coal Co.*, 358 S.W.2d 363, 364 (Ky. 1962) ("factors . . . contained in Restatement of the Law of Agency 2d, Section 220, subsection 2, . . . are substantially the same as the criteria cited in the First Edition of the Restatement of Agency"). The two versions are essentially interchangeable, although a tenth factor has been added. Neither party mentions this factor and it has no bearing on our analysis.

employee's tortious conduct. This second statute-influenced branch co-opted the nine factors from the first branch, leading to confusion of the kind seen in the briefs of all parties to this appeal. Distinguishing these branches from one another begins with understanding their origins. A good starting point is the nine factors.

The nine factors were first included in the original Restatement of the Law of Agency Section 220(2) (1933) because they were among the "traditional common law factors employed in determining whether an individual is an employee or independent contractor . . . ." *Kentucky Unemployment Ins. Comm'n v. Landmark Community Newspapers of Kentucky, Inc.*, 91 S.W.3d 575, 579 (Ky. 2002). In our ancient common law, that meant determining such relationship only in the context of *respondeat superior* liability – the only context in which the factors are found in the Restatement of Agency.

The factors are nested in the Restatement's Chapter 7, "Liability of Principal to Third Person; Torts." That chapter is divided into topics, and Section 220(2) is part of "Topic 2. Liability for Authorized Conduct or Conduct Incidental Thereto[.]" Within that topic, Section 220(2) is part of "Title B. Torts of Servant[.]"

Title B begins with Section 219, the general rule of *respondeat superior* liability, which is found immediately before the nine factors of Section 220. It is entitled, "When Master is Liable for Torts of His Servants." Pertinent

here, it says: "A master is subject to liability for the torts of his servants committed while acting in the scope of their employment." RESTATEMENT (SECOND) OF AGENCY § 219(1). Whether vicarious liability is possible therefore depends on the answer to the question: "Was the alleged tortfeasor the named defendant's servant?"

Right from the start, the Restatement answers the question generally. Section 2 of the Restatement (Second) of Agency defines "Master," "Servant," and "Independent Contractor" as follows:

> (1) A master is a principal who employs an agent to perform service in his affairs and who *controls or has the right to control* the physical conduct of the other in the performance of the service.
>
> (2) A servant is an agent employed by a master to perform service in his affairs whose physical conduct in the performance of the service *is controlled or is subject to the right to control by the master*.
>
> (3) An independent contractor is a person who contracts with another to do something for him but *who is not controlled by the other nor subject to the other's right to control* with respect to his physical conduct in the performance of the undertaking. He may or may not be an agent.

RESTATEMENT (SECOND) OF AGENCY § 2 (emphasis added). The master's ability (or inability) to control the servant's work is the key characteristic in defining each of these three roles. In Section 220, where we find the nine factors, emphasis on the control element is just as strong. Because context is important, and because no

-8-

Kentucky opinion has yet quoted Section 220 in its entirety, we do so here for the first time. It reads:

> (1) A servant is a person employed to perform services in the affairs of another *and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control*.
>
> (2) In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered:
>
>> (a) the extent of control which, by the agreement, the master may exercise over the details of the work;
>>
>> (b) whether or not the one employed is engaged in a distinct occupation or business;
>>
>> (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
>>
>> (d) the skill required in the particular occupation;
>>
>> (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
>>
>> (f) the length of time for which the person is employed;
>>
>> (g) the method of payment, whether by the time or by the job;
>>
>> (h) whether or not the work is a part of the regular business of the employer;

(i)  whether  or  not  the  parties  believe  they  are creating the relation of master and servant; and

(j)  whether the principal is or is not in business.[5]

RESTATEMENT (SECOND) OF AGENCY § 220 (emphasis added).  The critical factor for purposes of *respondeat superior* liability is control.

When the American Law Institute (ALI) published Restatement (Third) of Agency, Section 7.07 replaced Section 220, and it eliminated the nine factors to focus on control as the critical factor justifying a master's *respondeat superior* liability.  It states:

(1)  An employer is subject to vicarious liability for a tort committed  by  its  employee  acting  within  the  scope  of employment.

(2)  An employee acts within the scope of employment when  performing  work  assigned  by  the  employer  or engaging in a course of conduct *subject to the employer's control*.  An employee's act is not within the scope of employment when it occurs within an independent course of  conduct  not  intended  by  the  employee  to  serve  any purpose of the employer.

(3)  For purposes of this section,

(a)  an employee is an agent *whose principal controls  or  has  the  right  to  control  the manner  and  means  of  the  agent's performance of work*, and

---

[5] *See*, *supra*, footnote 4.

> (b) the fact that work is performed gratuitously does not relieve a principal of liability.

RESTATEMENT (THIRD) OF AGENCY § 7.07 (2006) (emphasis added). The ALI explains the rationale for the Restatement's emphasis on control as follows: "An employer's ability to exercise control over its employees' work-related conduct enables the employer to take measures to reduce the incidence of tortious conduct." *Id.* at comment b.

Why do the parties appealing this tort case struggle so with these nine factors? The answer is that our opinions have not clearly explained why *respondeat superior* jurisprudence always emphasizes the control element, while non-*respondeat superior* jurisprudence had good reasons to, and does, de-emphasize it. The explanation is traceable to that near-century-old, previously mentioned legislation protecting the American worker.

In 1936, three years after publication of the original Restatement of Agency, our legislature was "besieged and confronted with demands [for] . . . a Social Security Statute, in the form of unemployment compensation, the enactment of which laws would require the Legislature to make an annual appropriation unprecedented in its amount." *Martin v. Louisville Motors*, 276 Ky. 696, 125 S.W.2d 241, 244 (1939). The solution was to tax employers on their number of employees, and the tax collectors liberally defined the statutory term "employee."

The new legislation did not provide a definition and, so, the first Kentucky opinion to cite the Restatement of Agency's *respondeat superior* liability rules was not a tort case. It was a tax case. In *Barnes v. Indian Refining Company*, a petroleum refiner objected that taxing authorities were defining "employees" under the Unemployment Compensation Law broadly enough to include independent contractors. 280 Ky. 811, 134 S.W.2d 620, 621 (1939). The tax collectors concluded Indian Refining's independent contractor "who operates bulk stations for the handling of the company's petroleum products, on consignment . . . is an employee of the company within the meaning of the Unemployment Compensation Laws." *Id.* Rejecting the tax collector's conclusion, the Court cited Section 220, stating:

> Whether or not the facts of a particular situation give rise to the relationship of servant or of independent contractor to the one for whom an individual is acting must, of course, to some extent be a matter of degree. *See*, Restatement of the Law of Agency, Section 220.

*Id.* at 624. Beyond the *respondeat superior* context for which they were designed, the factors in Section 220(2) proved helpful in determining the employee-employer relationship for tax purposes. *Id.* at 623 (concluding in this context "'employer and employee' . . . are synonymous with . . . master and servant").

In *Barnes*, the Court notably rejected the tax collector's public policy argument "that the employment referred to in the Act is broader in its scope than

the ordinary master and servant relationship." *Id.* at 622. The Court saw no need to deviate from the requirement of strictly construing taxing statutes just because the tax aided the unemployed. But a workers' compensation expert did.

After *Barnes*, and before the ALI published Restatement (Second) of Agency in 1958, Professor Arthur Larson published his much-heralded work that became known simply as *Larson's Workmen's Compensation Law* (1952). He incorporated, word-for-word, only that part of Section 220(2) that made up the nine factors and discussed them in the distinct context of workers' compensation law. 1 Larson, *Workmen's Compensation Law*, § 43.10, p. 624 (1952). Larson distinguished his use of the nine factors in the workers' compensation context by rejecting the master's control as the critical factor, stating:

> "Should he [the claimant] be deprived of compensation because of the *vicarious liability requirement of control* of the details of the work? If, then, control of the details of the work should not be the most relevant factor for compensation purposes, which of the listed factors should be? The answer, it is submitted, should be this: *the nature of the claimant's work in relation to the regular business* of the employer." (Emphasis added.).

*Id.* (quoted in *Ratliff v. Redmon*, 396 S.W.2d 320, 325 (Ky. 1965)). Professor Larson thus indicated that in the context of the workers' compensation laws the nature of the work is "the most relevant factor" and not the master's control.

When Kentucky's high court decided its next workers' compensation case, it cited *Larson's Workmen's Compensation Law* and effectively declared its

-13-

independence from the Restatement of Agency, stating, "the approach to be used is that of determining the relation of employer-employee under the Workmen's Compensation Act rather than of master and servant or principal and agent in tort actions. The workmen's compensation approach is broader and uses a more liberal construction favoring the employee." *Brewer v. Millich*, 276 S.W.2d 12, 15 (Ky. 1955) (citing *Larson's Workmen's Compensation Law*, Vol. 1, § 44.31, p. 643).

Paradoxically, before the ink was dry on *Brewer*, the Court addressed the next workers' compensation case as if it were a *respondeat superior* tort case. Said the majority, "The primary test in determining the status of a workman, is whether the employer has the right of control over the worker." *New Independent Tobacco Warehouse, No. 3 v. Latham*, 282 S.W.2d 846, 848 (Ky. 1955). Justice Milliken tried in vain to prevent this backslide, stating in his dissent:

> The elements quoted from the Restatement of the Law of Agency [the nine factors] represent an analysis of common law relationships in an effort to determine, for example, *whether an individual was a servant so that the master could be made liable for his acts*. However, Workmen's Compensation laws are social in purpose, and the employer or master is relieved of unlimited common law liability to his employee by assuming a limited liability to him regardless of fault. As a consequence, the standard for determining whether an individual is an employee for purposes of Workmen's Compensation is, and should be, much more elastic than the standard applied for determining whether an employer is responsible for the acts of another person . . . .

*Id.* at 849 (Milliken, J., dissenting) (emphasis added).

-14-

Back and forth went the non-*respondeat superior* case law. Just two years after *New Independent*, the Court addressed another unemployment taxation case. The Court followed the specific tax-case precedent established in *Barnes v. Indian Refining* to decide *Sturgill v. Barnes*,[6] 300 S.W.2d 574 (Ky. 1957), *abrogated by Landmark Community Newspapers*, 91 S.W.3d 575. *Sturgill* reiterates the primacy of the control element, notwithstanding the court was not deciding a *respondeat superior* case. The Court said, "[W]hether a person is an employe or an independent contractor is to be determined under the common law rules of master and servant" and "the chief criterion is the right to control the details of the work." *Id.* at 577. Thus, this branch of non-*respondeat superior* jurisprudence continued to meander.

In the early 1960s, our high court seemed to be getting back on a course more consistent with Professor Larson and *Brewer* and Justice Milliken when it decided *Cove Fork Coal Co. v. Newcomb*, saying:

> [T]he approach to be used in determining the relationship of employer-employee under the Workmen's Compensation Act is broader and uses a more liberal construction favorable to the employee than the approach used in determining the relationship of master and servant or principal and agent in tort actions.
>
> In [a workers' compensation action] the creation of the employer-employee relationship does not require actual

---

[6] V.E. Barnes was a party in both these cases. According to a historical marker erected in Christian County by his friends in 1959, Vego E. Barnes (1889-1962) served some fifty years in county, state, and federal government.

and intimate control of the details of the work being performed, and it was indicated that all nine [Section 220(2) factors] were significant in giving aid to the solution of this problem in compensation cases.

343 S.W.2d 838, 840 (Ky. 1961) (citation omitted). At least in the workers' compensation area, the non-*respondeat superior* jurisprudence seemed to be settling. *See Sellards*, 358 S.W.2d at 364 ("No one of these factors is determinative, and each case must be decided on its own particular facts." (quoting *Locust Coal Company v. Bennett*, 325 S.W.2d 322, 324 (Ky. 1959)). At least this branch seemed to be distancing itself from the Restatement of Agency.

In 1965, obviously influenced by Professor Larson's work and not the Restatement of Agency, Kentucky's high court rendered what has been called a seminal case in Kentucky workers' compensation law, *Ratliff v. Redmon*, 396 S.W.2d 320 (Ky. 1965). The opinion made no mention of the Restatement. It did not need to. The nine factors were quoted with attribution only to page 624 of *Larson's Workmen's Compensation Law*. *Id.* at 324. In the context of workers' compensation jurisprudence, the nine factors took on a life of their own, entirely disengaged from the rest of the Restatement of Agency, and especially disengaged from Section 2 and Section 220(1), both of which undeniably emphasized the element of the master's control of the servant's work.

But at the end of the 1960s, just when the fog seemed to clear, the Court equivocated a bit, and "determined that four of the nine factors were of

-16-

paramount importance . . . ." *Purchase Transp. Servs. v. Estate of Wilson*, 39 S.W.3d 816, 818 (Ky. 2001) (citing *Chambers v. Wooten's IGA Foodliner*, 436 S.W.2d 265, 266 (Ky. 1969)). In *Purchase Transport*, the Court traced a special reliance on those four factors through *Husman Snack Foods Co. v. Dillon*, 591 S.W.2d 701, 703 (Ky. App. 1979), and *Uninsured Employers' Fund v. Garland*, 805 S.W.2d 116 (Ky. 1991). After describing this emphasis on four of the factors, *Purchase Transport* is unclear whether it actually applied that approach. *Purchase Transp.*, 39 S.W.3d at 818-19. It was past time for clarity.

In a 2002 opinion, the Supreme Court first stated the obvious: "It is evident that the case law is not in total harmony." *Landmark Community Newspapers*, 91 S.W.3d at 580. "We now correct this inconsistency[,]" said the Court. But did it? The opinion "hold[s] that not one of the aforementioned factors is determinative, and every case, where it must be determined whether an individual is an employee or an independent contractor *for unemployment insurance purposes*, needs to be resolved on its own facts." *Id.* (emphasis added). The Court thus discussed the confusion that occurred most frequently in workers' compensation cases, then selected one workers' compensation case to follow (*Locust Coal*, 325 S.W.2d at 324), and then applied the clarified rule, not in a workers' compensation case, but in the *unemployment* insurance benefits case it was deciding. *Landmark Community Newspapers*, 91 S.W.3d at 580.

-17-

Notwithstanding the Court's qualifying language highlighted in the previous quote, it is not logical that the Court intended to limit the rule in *Landmark Community Newspapers* to unemployment insurance cases. It must at least apply to the line of workers' compensation cases it expressly purported to clarify. But there have been even more sub-classes of non-*respondeat superior* cases that applied the nine factors without emphasizing the control factor.[7] We conclude the rule must apply to all non-*respondeat superior* cases, and only to non-*respondeat superior* cases.

The foregoing helps explain the confusion leading to the parties' indiscriminate citation of both *respondeat superior* cases and non-*respondeat superior* cases. The latter cases cited do not illuminate the doctrine of *respondeat superior*. In those cases, the master's control is not paramount. To be clear,

---

[7] The factors have been used to resolve insurance coverage issues; *i.e.*, whether an accident victim was an employee covered under the Workers' Compensation Act or an independent contractor entitled to claim under the employer's auto liability policy, *Kentucky Farm Bur. Mut. Ins. Co. v. Snell*, 319 S.W.2d 462, 464 (Ky. 1958), and when a decedent's heirs, asserting their lost loved one was an employee, claimed benefits under a company's group life insurance policy. *Mullins v. Western Pioneer Life Ins. Co.*, 472 S.W.2d 494, 495 (Ky. 1971).

In *Brown v. CSX Transp., Inc.*, the factors were used to deny a claim under the Federal Employers' Liability Act because the claimant was not an employee of a federal employer. 13 S.W.3d 631, 633 (Ky. App. 1999). This Court cited the nine factors to hold that the owner of a company was not his own employee for unemployment insurance purposes. *Borkowski v. Commonwealth*, 139 S.W.3d 531, 533 (Ky. App. 2004). We even used the factors in a mechanic's lien case to conclude a pre-lien notification requirement was not satisfied by notice to a general contractor who was not the land owner's agent, much less his servant. *Brock v. Pilot Corp.*, 234 S.W.3d 381, 385 (Ky. App. 2007).

-18-

however, the master's control over his servant, and thereby his ability to safeguard against the servant's tort, is the *raison d'être* of *respondeat superior* liability.

This control concept was engrained in Kentucky common law before the Restatement of Agency and before passage of legislation to protect workers.

> The power of control . . . is the test of liability, under the maxim *respondeat superior*. If the master cannot command the alleged servant, then the acts of the latter are not his, and he is not responsible for them. If the principal cannot control and direct the alleged agent, then he is not his agent, and the principal is not liable for his acts or his omissions. In such case the maxim *respondeat superior* has no application, because there is no superior to respond. In an action against an alleged master or principal for the act of his alleged servant or agent under the maxim *respondeat superior*, there can be no recovery in the absence of the right and power in the former to command or direct the latter in the performance of the act charged, because in such a case there is no superior to answer.

*Commonwealth v. Louisville & N.R. Co.*, 189 Ky. 309, 224 S.W. 847, 848-49 (1920) (citation and internal quotation marks omitted).

Nothing changed when the Restatement came into being, and Kentucky courts soon began relying on it. The Restatement of Agency was first cited in a *respondeat superior* case in 1943 when Barney Akers' wife "stumbled and fell over some newspapers in the vestibule of Katterjohn's Drug Store in Paducah and sustained an injury to her arm and shoulder." *Courier Journal & Louisville Times Co. v. Akers*, 295 Ky. 745, 175 S.W.2d 350, 351 (1943). Mrs. Akers sought to hold the newspaper liable. Discovery revealed that "Howard

Randle, manager and operator of the Yellow Cab Company, got [the bundle of newspapers] at the railway station for the purpose of delivering them to three places in the city. For this service he was paid by the month by the appellant, according to the number of trips he made during that time." *Id.*

It is obvious that the Court in *Courier Journal* seamlessly melded into our common law of *respondeat superior* the ALI's original Restatement of Agency, quoting it directly, as follows:

> "A principal employing another to achieve a result but not controlling nor having the right to control the details of his physical movements is not responsible for incidental negligence while such person is conducting the authorized transaction. * * *" Restatement, Agency, § 250.

*Id.* at 352. When Mrs. Akers tried a different angle – that Randle could not be an independent contractor because he had no enforceable independent contract – the Court specifically quoted Section 220:

> Another position taken by Mrs. Akers is that Randle could have been nothing more than an agent or employee of the appellant, because he had no enforceable contract and could have been discharged at any time. *Assuming, as Mrs. Akers contends, that Randle was an agent*, under the facts in this case he would still come under the rule in Restatement, Agency, § 220, p. 485, wherein it is said: "* * * An agent who is not subject to control as to the manner in which he performs the acts that constitute the execution of his agency is in a similar relation to the principal as to such conduct as one who agrees only to accomplish mere physical results. For the purpose of determining liability, they are both 'independent contractors' and do not cause the person for whom the enterprise is undertaken to be

-20-

> responsible. \* \* \*" Whether the contract was binding or not is immaterial in this case.

*Id.* (emphasis added). The Court thus recognized a master could not be vicariously liable for the conduct of a "non-servant agent" – *i.e.*, a person who although an agent was not a servant subject to the master's control. This concept was made clearer a decade and a half later when the ALI updated the language of Section 250 to read as follows:

> A principal is not liable for physical harm caused by the negligent physical conduct of a non-servant agent during the performance of the principal's business, if he neither intended nor authorized the result nor the manner of performance, unless *he* was under a duty to have the act performed with due care.

RESTATEMENT (SECOND) OF AGENCY § 250 (emphasis added) (referring to master's direct liability for breach of non-delegable duty described in Section 214, "Failure of Principal to Perform Non-delegable Duty"); *see also id.* at Section 220 comment e.[8]

---

[8] This comment, entitled "Independent contractors," states:

> The important distinction is between service in which the actor's physical activities and his time are surrendered to the control of the master, and service under an agreement to accomplish results or to use care and skill in accomplishing results. Those rendering service but retaining control over the manner of doing it *are not servants. They may be agents*, agreeing to use care and skill to accomplish a result and subject to the fiduciary duties of loyalty and obedience to the wishes of the principal; or they may be persons employed to accomplish or to use care to accomplish physical results, without fiduciary obligations, as where a contractor is paid to build a house. An agent who is not subject to control as to the manner in which he performs the acts that constitute the execution of his agency is in a similar relation to the principal as to such conduct as one who agrees only to accomplish

-21-

While the nine factors were serving our non-*respondeat superior* jurisprudence as a crutch in its struggle to find footing, Kentucky *respondeat superior* jurisprudence applied the full Restatement in a long line of cases, steadfastly consistent with the analysis in *Courier Journal*.  In each case, the decisive factor was whether the master controlled or had the right to control the specific work of the alleged tortfeasor.[9]

In 2006, when the third edition of the Restatement was published, the nine factors were removed in favor of a new section that functioned as "a consolidated treatment of topics covered in several separate sections of Restatement Second, Agency, including §§ 219 [and] 220 . . . ."  RESTATEMENT

---

mere physical results.  For the purpose of determining liability, they are both "independent contractors" and do not cause the person for whom the enterprise is undertaken to be responsible, under the rule stated in Section 219.

(Emphasis added.)

[9] Some of these published *respondeat superior* cases, in chronological order, that relied on the Restatements of Agency include:  *Sam Horne Motor & Implement Co. v. Gregg*, 279 S.W.2d 755, 756 (Ky. 1955) ("control by the company . . . probably the most significant consideration"); *Ambrosius Industries, Inc. v. Adams*, 293 S.W.2d 230, 236-37 (Ky. 1956) (not error to instruct jury as to single factor of control); *Fisher Equip. Co. v. West*, 365 S.W.2d 319, 321 (Ky. 1962); *Coleman v. Baker*, 382 S.W.2d 843, 846 (Ky. 1964) ("ultimate test is the control reserved or exercised by the employer"); *Rankin v. Blue Grass Boys Ranch, Inc.*, 469 S.W.2d 767, 775 (Ky. 1971) (master's control of alleged tortfeasor predominant factor), *superseded by statute on other grounds as stated in Mills v. Commonwealth*, 2004-SC-0140-MR, 2005 WL 2317982 (Ky. Sept. 22, 2005); *Ellis v. Jordan*, 571 S.W.2d 635, 639 (Ky. App. 1978); *Brooks v. Grams, Inc.*, 289 S.W.3d 208, 212 (Ky. App. 2008) ("right to control is considered the most critical element in determining the principal's liability for the tortious acts of an agent"); *Collins v. Appalachian Research and Defense Fund of Kentucky, Inc.*, 409 S.W.3d 365, 369 (Ky. App. 2012) (emphasizing Restatement (Third) of Agency Section 7.07 focuses on employee being "subject to the employer's control").

-22-

(THIRD) OF AGENCY § 7.07, Reporter's Notes a. (2006). Our Supreme Court approved of the Restatement's third edition and specifically relied upon Section 7.07 to decide the *respondeat superior* case of *Papa John's International, Inc. v. McCoy*, 244 S.W.3d 44, 51 (Ky. 2008).

In 2016, the Supreme Court said, "Under the common law doctrine of *respondeat superior*, 'a principal is vicariously liable for damages caused by torts of . . . an agent or subagent, *other than an independent contractor*, acting on behalf of and pursuant to the authority of the principal.'" *Saint Joseph Healthcare, Inc. v. Thomas*, 487 S.W.3d 864, 876 (Ky. 2016) (Supreme Court's emphasis) (quoting *Taylor v. Jewish Hosp. & St. Mary's Healthcare, Inc.*, 26 F. Supp. 3d 642, 648 (W.D. Ky. 2014)). This language is a little less direct than that of the Restatement, but its meaning and effect are identical. The proponent of vicarious liability based on the doctrine of *respondeat superior* liability must establish that the alleged agent was a servant and not an independent contractor. Proving the tortfeasor was the master's servant is accomplished by evidence that the master controlled the conduct of the servant that resulted in the tort.

When Cundiff argues that none of the nine factors carries greater weight in this case than any other, he is relying on non-*respondeat superior* jurisprudence inapplicable to this *respondeat superior* case. On the pivotal question whether Jewish Hospital controlled Dr. Dowden, Cundiff's candor is

decisive. To quote his own brief, "Jewish Hospital did not control the radiologists' work." (Appellant's brief, p. 15).

Still, Cundiff argues that because some of the nine factors weigh against Jewish Hospital, the jury should decide whether Dr. Dowden is its servant. We disagree. What we said years ago on this subject remains so today:

> We believe one word is necessary concerning submission of the question of agency to the jury. In Restatement (Second) of Agency § 220 (1958) in Comment C to Subsection (1) at 487 we find:
>
> > If the inference is clear that there is, or is not a master and servant relation, it is made by the court; otherwise the jury determines the question after instruction by the court as to matters of fact to be considered.

*Ellis v. Jordan*, 571 S.W.2d 635, 639 (Ky. App. 1978). The inference is clear in this case that Jewish Hospital was not in a position of control over the conduct of Dr. Dowden and, therefore, Dr. Dowden was not Jewish Hospital's servant when he allegedly committed a tort.

We conclude the circuit court correctly found, as a matter of law, that Jewish Hospital was not liable to Cundiff on a theory of *respondeat superior*.

B. *Ostensible agency*

The circuit court found no genuine issue of material fact whether Dr. Dowden was Jewish Hospital's ostensible agent and concluded the hospital was entitled to judgment as a matter of law. The order states:

There is no evidence to support any claim of ostensible agency as [Cundiff] did not personally observe the radiologists and the radiologists did not interact with [Cundiff] during his treatment. As such, [Cundiff] could not have formed any impression that the radiologists were employed by or somehow [were] agents of the hospital. In addition to the foregoing, [Cundiff's] deposition testimony clearly indicates he knew the various physicians and other health professionals who treated him were not employees or agents of the Jewish Hospital. [Cundiff] argues the fact that the radiologists wore KentuckyOne Health name badges should be determinative. For the reasons stated, the Court finds this argument unpersuasive. There is no genuine issue of material fact and summary judgment is appropriate as a matter of law.

(Order, granting summary judgment, Dec. 19, 2018).

Cundiff relies predominantly on *Paintsville Hospital Company v. Rose*, 683 S.W.2d 255 (Ky. 1985), a wrongful death case involving a 16-year-old, in which a split court held that ostensible agency "is a viable legal theory under our law" to hold a hospital liable for the negligence of an emergency room physician. *Id.* at 256-258 (4-3 majority). The case has limitations. More importantly, it has been abrogated, in part, by *Sneed v. University of Louisville Hospital*, 600 S.W.3d 221 (Ky. 2020), an opinion rendered after the parties briefed this case.

In *Paintsville Hospital*, after noting that, in other jurisdictions, ostensible agency "has been generally applied not only to anesthesiologists, but to pathologists, radiologists, and emergency room physicians," the Court did not expand Kentucky law beyond the facts before it, relying only on "cases *applying*

-25-

*ostensible agency to emergency room physicians* in circumstances similar to the present case . . . ." *Id.* at 257 (emphasis in original). The Court concluded that:

> The circumstances under which the hospital is liable are not unlimited. But *the operation of a hospital emergency room* open to the public, where the public comes expecting medical care to be provided through normal operating procedures within the hospital, *falls within the limits for application of the principles of ostensible agency* and apparent authority.

*Id.* at 258 (emphasis added). Noting "the usual circumstances of the patient at the time he seeks out the emergency room for treatment[,]" the Court did not make clear whether its holding applied only to the emergency room scenario. *Id.*

Nevertheless, emergency care undertaken by medical professionals physically interacting with the patient on the one hand, and scheduled medical procedures involving specialists who never see the patient in person on the other, present categorically different sets of facts that, generally speaking, make a finding of ostensible agency less likely in the latter circumstances.

*Paintsville Hospital* views the emergency room circumstances through the eyes of the patient and concludes "it is unreasonable to put a duty on the patient to inquire of each person who treats him whether he is an employee or independent contractor of the hospital." *Id.* Assessing "the public's reasonable expectation of [an] emergency room physician[,]" the Court said, "'*Absent notice to the contrary*,'" an emergency room patient "'had the right to assume that the

treatment received was being rendered through hospital employees and that any negligence associated with that treatment would render the hospital responsible.'" *Id.* at 258 (emphasis added) (quoting *Arthur v. St. Peters Hospital*, 169 N.J. Super. 575, 405 A.2d 443, 447 (1979)).

*Paintsville Hospital* does not explain how a hospital assures and confirms "notice to the contrary," especially considering "[t]he realities of the situation" – the justifiably frenetic provision of emergency medical care. *Id.* at 258. *Sneed*, *supra*, brought balance to these considerations.

In *Sneed*, a woman suffered post-natal complications and instituted a lawsuit alleging medical negligence against the two delivery room physicians and University of Louisville Hospital. 600 S.W.2d at 225. After the circuit court entered summary judgment in favor of the hospital, the woman appealed, claiming that despite the physicians' actual independent contractor relationship with the hospital, she had the reasonable belief they were the hospital's agents. She argued that the physicians were the hospital's ostensible agents because the hospital did not notify her adequately to the contrary. *Id.* at 230.

Unlike the plaintiff in *Sneed*, Cundiff was never in the same room as his alleged tortfeasor and, therefore, no one represented, explicitly or implicitly, either that Dr. Dowden was an employee or that he was not. Still, Cundiff said the

determinative factor was Dr. Dowden's identification badge which included his name, of course, but also that of Jewish Hospital.

Cundiff alleges Dr. Dowden (and a second radiologist) "wear identification badges which are identical in every manner to the badges worn by Jewish Hospital employees," that *would have* given Cundiff the impression "the radiologists were indeed employees if [he] did meet one of them." (Appellant's brief, p. 18). We agree with Jewish Hospital that these badges, even if Cundiff had seen them, did not suggest an employment relationship. Jewish Hospital is not indicated on the badge and only the KentuckyOne logo appears. Similar badges actually observed by the patient in *Sneed* and actually including the hospital's name were not enough to create the appearance of such a relationship. *See Sneed*, 600 S.W.3d at 230 ("both doctors wore medical scrubs and name badges [that] . . . read 'University of Louisville'"). We fail to see how badges Cundiff never saw on a doctor he never met could possibly create an impression of an employee-employer or agent-principal relationship.

Cundiff relies on *Paintsville Hospital's* suggestion of a legal presumption of Dr. Dowden's employee status (the opinion uses the word "assume"). Even if we assume such a presumption ever existed, *Sneed* explains how it is rebutted. And it was rebutted here.

-28-

Specifically, Cundiff says the three consent forms presented to him did not establish the kind of "notice to the contrary" required by *Paintsville Hospital*. (Appellant's brief, pp. 18-20). Under similar notice-to-the-contrary facts, *Sneed* found that treating physicians in the delivery room were not the hospital's ostensible agents. The Court explained why.

Prior to *Sneed*, the Supreme Court had not considered "what type of notice is necessary to constitute 'notice to the contrary,'" but the Court of Appeals had, in *Floyd v. Humana of Virginia, Inc.*, 787 S.W.2d 267 (Ky. App. 1989). From *Floyd* and other cases, the Supreme Court adopted guidance that balances the patient's reasonable expectations with the reasonableness of the hospital's duty.

Whether a physician should be deemed the hospital's ostensible agent "turn[s] on whether the hospital holds its physicians out to be employees or something else . . . [and i]t is a matter of appearances, fairly chargeable to the principal and by which persons dealt with are **deceived**, and on which they rely." *Sneed*, 600 S.W.3d at 233 (Supreme Court's emphasis; citation and internal quotation marks omitted). The Court concluded:

> under Kentucky law the actions of the hospital, rather than the knowledge of the patient, is controlling in a case where the patient is unable to obtain actual knowledge of the hospital's disclaimer. Here, Humana clearly **attempted to** alert the public that its physicians were not employees or agents of the hospital. The District Court, therefore, properly concluded that the surgical residents were not ostensible agents of the hospital.

*Id.* (Supreme Court's emphasis).

In *Sneed* and in the case before us, the patient's testimony established the respective patient's knowledge that physicians were not hospital employees. *See id.* at 232. In both *Sneed* and in the case before us, the forms presented to Cundiff, and those he signed or acknowledged, were imperfect in their design and execution. *See id.* at 230-231, 233. The law does not require perfection.

Paraphrasing *Sneed*, we conclude that, despite potential ambiguities in the hospital's forms, Jewish Hospital took reasonable steps to notify patients they would be treated by independent contractor physicians. We see no evidence of any intent to deceive patients into believing that the physicians were Jewish Hospital employees, nor do we see evidence that the physicians were held out as employees. Therefore, we hold that no genuine issue of material fact existed as to whether Dr. Dowden was an ostensible agent of Jewish Hospital. We affirm the Jefferson Circuit Court in dismissing the claims of vicarious liability against Jewish Hospital for the conduct of Dr. Dowden.

**2. *Cundiff failed to preserve his claim that the court erred during voir dire***

During *voir dire*, prospective jurors were questioned about biases that might affect their decision if seated on the jury. Juror 2225780 stated his wife was a nurse at Jewish Hospital for twelve years and is currently employed at "VNA" home healthcare, a KentuckyOne subsidiary. When asked if he would be

uncomfortable "sitting in a position of judgment in a case involving nurses," he responded, "no, I don't think so." When further asked if he would have difficulty finding in favor of the plaintiff if the evidence indicated the standard of care had been breached, he replied, "I don't think so."

Cundiff moved to strike Juror 2225780 for cause. The circuit court denied the motion. Significant to this appeal, Cundiff declined to use a peremptory strike on Juror 2225780. Instead, Cundiff exhausted his peremptory strikes on different prospective jurors, and noted, orally, that Juror 2225780 would have been stricken if he had additional peremptory strikes.

Our Supreme Court set forth "a definitive statement of the procedure required to preserve a for cause strike error." *Floyd v. Neal*, 590 S.W.3d 245, 250 (Ky. 2019). That Court held:

> to preserve the error that a trial court failed to strike a juror for cause a litigant must: (1) move to strike the juror for cause and be denied; (2) exercise a peremptory strike on said juror, and show the use of that peremptory strike on the strike sheet, and exhaust all other peremptory strikes; (3) clearly indicate by writing on her strike sheet the juror she would have used a peremptory strike on, had she not been forced to use a peremptory on the juror complained of for cause; (4) designate the same number of would-be peremptory strikes as the number of jurors complained of for cause; (5) the would-be peremptory strikes must be made known to the court prior to the jury being empaneled; and (6) the juror identified on the litigant's strike sheet must ultimately sit on the jury.

-31-

*Id.* at 252. The Court demands strict compliance with the preservation requirements. *See id*. at 248-52.

Cundiff had the opportunity but failed to exercise a peremptory strike on Juror 2225780. In addition, he did not clearly indicate, in writing, the jurors he would have excused with a peremptory strike if possible. Accordingly, he has failed to meet the preservation requirements set forth in *Floyd*. This Court will not review an issue not properly preserved for review.

### 3. *Motion for a New Trial*

We decline to review any issues associated with the denial of Cundiff's CR 59.05 motion to alter, amend, or vacate because "orders denying CR 59.05 motions are interlocutory and not subject to appellate review." *Ford v. Ford*, 578 S.W.3d 356, 359 (Ky. App. 2019).

### CONCLUSION

We affirm the Jefferson Circuit Court. Because we are affirming, we do not address the issues raised by Jewish Hospital in its cross-appeal.

ALL CONCUR.

-32-

BRIEFS FOR APPELLANT/ CROSS-APPELLEE REBECCA CUNDIFF:

Andrew S. Epstein
Louisville, Kentucky

BRIEF FOR APPELLEES DR. ALLEN CHENG AND UNIVERSITY OF LOUISVILLE PHYSICIANS, INC.:

Susan D. Phillips
Patricia C. LeMeur
David Thompson
Louisville, Kentucky

BRIEFS FOR APPELLEES/CROSS-APPELLANTS JEWISH HOSPITAL & ST. MARY'S HEALTHCARE, INC. AND KENTUCKYONE HEALTH, INC.:

B. Todd Thompson
Eleanor M.B. Davis
Joseph A. Wright
Louisville, Kentucky